2024 IL App (1st) 221222-U

FIFTH DIVISION
May 10, 2024

No. 1-22-1222

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 20279 |
| | ) | |
| ANTOINE REYNOLDS, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE MIKVA delivered the judgment of the court.
Justice Lyle concurred in the judgment.
Justice Navarro concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*: Summary dismissal of defendant's postconviction petition at the first stage is reversed. Defendant has put forward the gist of a claim that he received ineffective assistance of counsel where all the evidence against him was eye-witness identification testimony and his trial counsel failed to obtain an expert regarding the potential unreliability of such testimony.

¶ 2    Defendant Antoine Reynolds appeals the summary dismissal of his petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). He argues that the circuit court erred in summarily dismissing his petition where he set forth the gist of a constitutional claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S.

668 (1984), for failing to present expert testimony regarding the potential unreliability of eyewitness identification testimony. For the following reasons, we reverse.

¶ 3                                I. BACKGROUND

¶ 4      Following a jury trial, Mr. Reynolds was found guilty of first degree murder while armed with a firearm (720 ILCS 5/9-1(a)(1), (2) (West 2010)) and sentenced to 50 years in prison. This court affirmed his conviction on direct appeal. *People v. Reynolds*, 2021 IL App (1st) 190590-U. We recite the evidence here to the extent necessary for our disposition of Mr. Reynolds's postconviction contentions.

¶ 5      Prior to trial, Mr. Reynolds moved to suppress identification testimony, which the court denied. During a subsequent hearing, trial counsel stated that, in light of the court's ruling on the motion to suppress, counsel "need[ed] to look into" expert witness testimony regarding identification evidence. The record contains no further discussion of the defense calling an expert on this topic.

¶ 6      The evidence at trial established that at approximately 6:22 p.m. on July 6, 2011, a group of people congregated on the corner of 61st Street and Normal Avenue in Chicago. A gold Cadillac pulled alongside the group, and one or more individuals in the vehicle began shooting at the group. Davonta Childress and Michael Barnes were shot, and Mr. Childress died from his injuries. Following an investigation conducted that night, Mr. Barnes identified Marlon Boyce as the driver of the gold Cadillac.

¶ 7      No one identified the backseat shooter. Two years later, the case was reopened. As part of that reopened investigation, four eyewitnesses identified Mr. Boyce as the driver of the gold Cadillac, and two of the four eyewitnesses, Terry Butler and Calvin Garrett, also identified Mr. Reynolds as the backseat shooter.

¶ 8     Mr. Reynolds and Mr. Boyce were tried simultaneously by two separate juries in November 2018. Mr. Boyce is not a party to this appeal.

¶ 9     Mr. Butler was the State's primary identification witness against Mr. Reynolds. Mr. Butler testified that he had known Mr. Boyce his entire life from the neighborhood. Mr. Butler had met Mr. Reynolds, whom he knew as "Antonio," through Mr. Boyce but had known him for only approximately two years. Mr. Butler had conversations with Mr. Reynolds multiple times but never "hung out" with him.

¶ 10    On the night of the shooting, Mr. Butler saw Mr. Boyce driving the gold Cadillac and saw Mr. Reynolds "raise up out of the back seat from the laying-down position" with a large firearm, like a "machine gun." Mr. Butler turned to run when the shooting began, but he fell and remained on the ground until the shooting ended. Mr. Butler described the shooting as a "rapid fire" of 15 to 20 gunshots. After a pause, he heard more gunshots, which he described as "more of a handgun sound," but he did not see who fired those gunshots. Mr. Butler went to the hospital that evening because of an injury caused by a ricocheting bullet. At the hospital, he told police that he did not know the shooter. Mr. Butler testified that he did so because he was scared.

¶ 11    On July 29, 2014, when Mr. Butler was in jail for an unrelated felony firearm charge, detectives approached him. Chicago police detective Oscar Arteaga conducted a photo array, and Mr. Butler identified Mr. Boyce as the driver of the gold Cadillac. Mr. Butler gave Detective Arteaga the name "Antonio" for the backseat shooter. Detective Arteaga then showed Mr. Butler a photograph of Mr. Reynolds, whom Mr. Butler said was Antonio, the backseat shooter. The next day, Mr. Butler testified in front of the grand jury, where he again identified Mr. Reynolds in a photograph as the backseat shooter. At trial, Mr. Butler also made an in-court identification of Mr. Reynolds.

¶ 12 Mr. Butler was not aware that the police were looking for him during the period between when he spoke to officers at the hospital in 2011 and when detectives approached him in jail in 2014. Mr. Butler did not think that he gave Detective Arteaga Mr. Reynolds's last name in their 2014 conversation, but confirmed he gave the detective the name "Antonio" for the backseat shooter. He also confirmed that he did not know Mr. Reynolds well.

¶ 13 Mr. Butler acknowledged that he had a felony conviction for possession of fraudulent identification. After speaking with Detective Arteaga, Mr. Butler received a minimum sentence for a pending charge of aggravated unlawful use of a weapon.

¶ 14 Calvin Garrett testified that on the night of the shooting, he stopped his pickup truck across the street from where the group was congregated and talked with Mr. Childress. As they spoke, a gold Cadillac pulled between Mr. Garrett's pickup truck and where Mr. Childress stood. Mr. Garrett saw two people inside the gold Cadillac: the driver and a backseat passenger on the driver's side. The backseat passenger started shooting "an assault rifle or something." Mr. Garrett saw Mr. Childress get struck in the pelvic area and fall. Mr. Garrett then heard more gunshots from the vehicle that sounded like a second firearm, but he did not see the shooter. The shooting lasted a couple seconds and then the gold Cadillac sped off. Mr. Garrett recognized the driver from "the area," but did not know the person in the back and had never seen him before.

¶ 15 After the shooting, Mr. Garrett drove Mr. Childress to the hospital. Mr. Garrett testified that he provided a description of the vehicle at the hospital, but not the driver or the shooter. Two days later, on July 8, 2011, Mr. Garrett told police detectives who came to his home that he did not know who was in the vehicle. He testified that he said "don't even bother" showing him a photo array because he did not see the occupants of the vehicle. Mr. Garrett testified he did so because he was scared.

¶ 16    The next time that Mr. Garrett spoke with the police was on July 27, 2014. At that time, he identified the driver of the car by the name "Marlon." He also identified Mr. Boyce from a photo as the driver. He then testified before the grand jury about the identification of Mr. Boyce as the driver. When Mr. Garrett was asked at the grand jury whether he got a good look at the passenger, he answered, "No, I did not see the passenger."

¶ 17    On October 3, 2014, Mr. Garrett viewed another lineup and, for the first time, identified Mr. Reynolds as the backseat passenger and shooter. He confirmed that during the October 3, 2014, lineup viewing, when he was asked if he recognized anyone from the evening of the shooting, he said that he recognized an individual "from a glimpse of the face, that's it." Mr. Garrett explained, "I didn't really know exactly who this guy is. I don't know this guy, never seen this guy." He also testified that he had never seen Mr. Reynolds before in the neighborhood. At trial, Mr. Garrett identified Mr. Reynolds in court as the backseat shooter.

¶ 18    On cross-examination, Mr. Garrett said that he could not recall his grand jury testimony in which he had said that he did not see the shooter. Mr. Garrett confirmed his grand jury testimony stating that a black hoodie covered the shooter's face, but testified at trial that this was not correct.

¶ 19    Mr. Reynolds's trial counsel brought out several issues surrounding Mr. Garrett's lineup identification of Mr. Reynolds. Mr. Reynolds was the only person in the lineup with facial tattoos and was one of only two people in the lineup without shoelaces. Mr. Garrett acknowledged that he knew from personal experience that people in custody had their shoelaces taken away. Mr. Garrett also acknowledged that he had identified Mr. Reynolds as the shooter only because he had glimpsed the shooter "from the side." Before viewing the lineup on October 3, 2014, he never told anyone that the backseat shooter had facial hair and face tattoos. Mr. Garrett also acknowledged that he had two felony convictions.

¶ 20    The defense called Chicago police officers Thomas Erlich and Joseph Aguirre. Officer Erlich testified that he interviewed Mr. Garrett at the hospital after the shooting and testified that Mr. Garrett did not describe the vehicle or the offenders at that time. Officer Aguirre testified that he interviewed Mr. Garrett on July 9, 2011, but did not show him a photo array because Mr. Garrett said that he did not see the shooter.

¶ 21    The jury began deliberations on the evening of November 9, 2018. They deliberated that evening, the next day, and again on November 12, 2018. During their deliberations, the jurors sent out several notes, including ones asking for a definition of reasonable doubt, advising the court that they could not reach a unanimous verdict, and requesting a transcript of Calvin Garrett's grand jury testimony and, later, a transcript of Terry Butler's trial testimony. On November 12, 2018, the jury found Mr. Reynolds guilty of first degree murder while armed with a firearm. Mr. Reynolds was sentenced to a total of 50 years in custody.

¶ 22    On direct appeal, Mr. Reynolds argued that Mr. Garrett's and Mr. Butler's eyewitness identifications of him as the shooter were unreliable and therefore insufficient evidence to prove his guilt. This court affirmed. *Reynolds*, 2021 IL App (1st) 190590-U, ¶ 87.

¶ 23    On March 28, 2022, Mr. Reynolds filed this *pro se* postconviction petition. On April 21, 2022, he filed a motion to supplement, which included claims that trial counsel provided ineffective assistance for failing to present an eyewitness identification expert at trial to challenge the reliability of the eyewitness identifications and that appellate counsel was ineffective for failing to raise this ineffective assistance of trial counsel.

¶ 24    On June 21, 2022, the circuit court summarily dismissed the petition as frivolous and patently without merit. In its written order, the court found the claim that trial counsel was ineffective for failing to offer expert eyewitness identification testimony was forfeited because Mr.

Reynolds challenged the reliability of Mr. Garrett's and Mr. Butler's identifications on direct appeal and could have raised the failure to call an eyewitness identification expert at that time. The court also found the claim failed on the merits. The court noted that Mr. Reynolds failed to attach an affidavit showing the potential testimony an expert witness on eyewitness identifications would have provided or explain the significance of that proposed testimony. The court stated that the decision not to call an expert is not *per se* ineffective assistance, as doing so may have prompted the State to call its own witness to offer a contrasting opinion. The court also found that Mr. Reynolds failed to establish that had appellate counsel raised trial counsel's ineffectiveness for failing to call such an expert, his conviction would have been reversed.

¶ 25                                    II. JURISDICTION

¶ 26    The circuit court summarily dismissed Mr. Reynolds's postconviction petition on June 21, 2022, and Mr. Reynolds timely filed his notice of appeal by placing it in the mail on July 21, 2022. See *People v. Hayes*, 2022 IL App (1st) 190881-B, ¶ 18 ("A *pro se* incarcerated litigant timely files their notice of appeal if the notice is placed in the institutional mail within 30 days of the judgment being appealed."). We have jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 606 (eff. March 12, 2021) and Rule 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings.

¶ 27                                    III. ANALYSIS

¶ 28    On appeal, Mr. Reynolds contends that the circuit court erred in summarily dismissing his *pro se* petition because he presented an arguable claim that trial counsel was ineffective for failing to present an expert to discuss the flaws of eyewitness identification testimony in a case which hinged entirely on two eyewitness identifications. Although Mr. Reynolds did not attach an

affidavit as to the expert witness's proposed testimony, in his brief he asserts that an eyewitness identification expert would have testified about the effects of weapons focus, the low correlation between confidence and accuracy, and other common misconceptions about eyewitness identifications, which would have supported his misidentification defense. He also claims that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness for not calling such an expert.

¶ 29 The Act provides criminal defendants with a means to challenge their convictions or sentences based on substantial violations of their rights under the federal or state constitutions. *People v. Morris*, 236 Ill. 2d 345, 354 (2010). The Act sets forth a three-stage process for adjudicating a postconviction petition. *People v. English*, 2013 IL 112890, ¶ 23. In this case, the trial court dismissed the petition at the first stage of proceedings. At this stage, the circuit court must determine whether a petition sets forth "sufficient facts to state the gist of a constitutional claim." *People v. Allen*, 2015 IL 113135, ¶ 24. If the circuit court determines that the petition is "frivolous or is patently without merit," the petition shall be dismissed in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2022). A petition may be found frivolous or patently without merit only where it has "no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 12 (2009). The circuit court must take the allegations in the petition as true and construe them liberally. *Allen*, 2015 IL 113135, ¶ 25. We review summary dismissals of postconviction claims *de novo*. *Id*. ¶ 19.

¶ 30 A. Mr. Reynolds Has Not Forfeited His Sixth Amendment Claim

¶ 31 The State contends, and the trial court found, that Mr. Reynolds forfeited the issue of trial counsel's effectiveness because it was not raised on direct appeal. Postconviction claims are limited to constitutional issues which have not been, and could not have been, previously adjudicated. *People v. Harris*, 224 Ill. 2d 115, 124 (2007). However, as our supreme court has

recognized, "[i]t is an altogether common occurrence that the viability of a *Strickland* claim will turn on matters outside the record." *People v. Cherry*, 2016 IL 118728, ¶ 33. The procedures outlined in the Act provide the remedy in such cases because they allow the court to consider "constitutional questions which, by their nature, depend[ ] upon facts not found in the record." *Id.* (citing *People v. Thomas,* 38 Ill.2d 321, 324 (1967)). See also *People v. Veach*, 2017 IL 120649, ¶ 47 (finding no forfeiture of a *Strickland* claim that is not raised on direct review if the claim depends on facts not found in the record).

¶ 32    Ultimately, it is clear that Mr. Reynolds cannot succeed on this claim without evidence from the expert witness that he claims his trial counsel should have called. As our supreme court has recognized, "In cases where a postconviction petitioner raises a claim of ineffective assistance based on counsel's failure to call a witness, an affidavit from the proposed witness will be required if it is essential for the postconviction petitioner to make the necessary 'substantial showing' to support a claim of ineffective assistance." *People v. Dupree*, 2018 IL 122307, ¶ 34. This is a matter outside the record on appeal and one which could not be brought on direct appeal. Thus, Mr. Reynolds' failure to raise this on direct appeal is not a forfeiture of this claim.

¶ 33    The State argues that if we do not find forfeiture, we should dismiss this petition because Mr. Reynolds did not support his claim that trial counsel was ineffective with an affidavit. However, the arguably missing and relevant evidence here is expert testimony. As we have recognized, Mr. Reynolds cannot reasonably be expected to procure such evidence as an indigent *pro se* petitioner confined to prison. *People v. Herring*, 2022 IL App (1st) 210355, ¶¶ 34-35. Requiring expert testimony at this stage would place an "unreasonable burden" on Mr. Reynolds, and his petition should not be dismissed at the first stage because he could not perform a near-

impossible task. *Herring* ¶¶ 34-35. While, at the second stage, where Mr. Reynolds will be appointed counsel, he will surely be expected to let the court know what the missing testimony would have been, this is not a basis for finding forfeiture at this point.

¶ 34 Thus, we reject the State's arguments that we should dismiss this petition either because Mr. Reynolds failed to raise this claim on direct appeal or because he failed to attach an affidavit showing what the expert testimony would have been. This takes us to the merits of Mr. Reynolds's postconviction claim.

¶ 35 B. Mr. Reynolds has Stated the Gist of a Sixth Amendment Claim

¶ 36 A defendant in a criminal proceeding has a constitutional right to the effective assistance of counsel. *People v. Lewis*, 2022 IL 126705, ¶ 44. A criminal defendant's ineffective assistance claim is evaluated under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Cross*, 2022 IL 127907, ¶ 19. At the first stage of proceedings under the Act, a petition alleging ineffective assistance of counsel may not be summarily dismissed if "(i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." (Emphasis and internal quotation marks omitted.) *People v. Tate*, 2012 IL 112214, ¶ 19. A defendant must satisfy both prongs of *Strickland* to prevail on an ineffective assistance of counsel claim. *People v. Pingelton*, 2022 IL 127680, ¶ 53.

¶ 37 To show that counsel's performance was deficient, the defendant must show that counsel was not functioning as "counsel," as guaranteed by the sixth amendment. *People v. Easley*, 192 Ill. 2d 307, 317 (2000). To show this, a defendant must establish that counsel's action or inaction was not the product of sound trial strategy. *Id*. Under the prejudice prong, the defendant bears the burden of showing "a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different." *Lewis*, 2022 IL 126705, ¶ 46. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.* If a defendant fails to establish prejudice, this court need not consider whether counsel's conduct was deficient. *People v. Garcia*, 2023 IL App (1st) 172005, ¶ 55. However, at this stage, the only showing that Mr. Reynolds must make is that it is "arguable" that he can make both of the necessary showings—deficiency and prejudice.

¶ 38    In *People v. Lerma*, 2016 IL 118496, the Illinois Supreme Court recognized that research into the accuracy of eyewitness misidentifications had become widely accepted and a valid source of expert testimony. The court held that expert testimony about eyewitness identification is admissible in cases where it is both "relevant and appropriate." *Id.* ¶ 26. In that case, the only evidence of the defendant's guilt was the eyewitnesses' identification and the decedent's excited utterance. *Id.* Several variables cited by the defendant's proffered expert witnesses could have "potentially" contributed to a finding that the eyewitness testimony in that case was unreliable, including: the implications of stress, the use of a weapon, the effect of a partially obscured face, exposure to post-event information, and cross-racial identification. *Id.* ¶ 16. Our supreme court concluded that "expert eyewitness testimony would be both probative and admissible" under the facts of the case and it was therefore an abuse of discretion not to have admitted this testimony at trial. *Id.* ¶¶ 26-27.

¶ 39    Since our supreme court decided *Lerma,* we have held that a postconviction claim of ineffective assistance based on defense counsel's failure to call an expert on eyewitness identification should not be dismissed at the first stage. *People v. Hayes*, 2022 IL App (1st) 190881-B, ¶¶ 34-37. In *Hayes*, there was no physical evidence linking the defendant to the crime and the defendant made no admissions. The State's case hinged on eyewitness identifications. As

the *Hayes* court recognized, under these circumstances, "counsel should have investigated and sought admission of an expert witness on eyewitness identification given the facts." *Id.* ¶ 37. The court concluded:

> "[A]dding the value of an identification expert, at least arguably, could have added to [the defendant's] defense, we find it at least arguable that [the defendant] was prejudiced by counsel's at least arguably deficient performance. *** Accordingly, [the defendant] has satisfied the low pleading bar justifying further proceedings."

¶ 40     At least one panel of this court has followed *Hayes*, albeit in an unpublished Rule 23 order. See *People v. Vasquez,* 2024 IL App (1st) 221588-U ¶¶ 29-37; see also Ill. S. Ct. R. 23(e)(1) (permitting citation of nonprecedential orders entered under Rule 23(b) as persuasive authority). Other panels have distinguished it. See *People v. Boone*, 2023 IL App (1st) 220433-U, ¶ 71, *petition for leave to appeal pending* (distinguishing *Hayes* based on the court's view that the identifications involved in the case before it were stronger and noting that, like *Hayes*, the defendant's trial was held before *Lerma* was decided, but, unlike *Hayes*, there was no specific allegation in the postconviction petition that "counsel knew about the law and science surrounding expert identification testimony"); *People v. Talbert*, 2023 IL App (1st) 200423-U, ¶¶ 57-59 (distinguishing *Hayes* based on the fact that the defense had also called eyewitnesses and expert testimony would "necessarily call[ ] into question the fallibility of both the State and defense eyewitnesses"); *People v. Elliott*, 2022 IL App (1st) 192294, ¶¶ 44-50 (distinguishing *Hayes* in part on the basis that the shooting was in broad daylight and the witness knew the defendant; also noting that it was a direct appeal and not a first stage postconviction petition). See also *People v. Burke,* 2021 Il App (1st) 200250-U ¶34 (decided before *Hayes* and noting that

before *Lerma,* it was " 'common practice in Illinois' to exclude expert testimony of the reliability of eyewitness identification" (quoting *Lerma*)).

¶ 41    Similarly to *Hayes*, in Mr. Reynolds's case, it is at least arguable that trial counsel performed unreasonably in not calling an expert to testify about the unreliability of the eyewitness identifications here. At Mr. Reynolds's jury trial, the State's case hinged exclusively on the accuracy of the two eyewitnesses' identifications of Mr. Reynolds. There was no physical evidence linking Mr. Reynolds to the shooting, no circumstantial evidence linking him to the scene, and he did not confess. Significantly, unlike in *Hayes*, where the trial occurred before *Lerma* was decided in 2016 (*Hayes*, 2022 IL App (1st) 190881-B, ¶ 34), the trial in Mr. Reynolds's case took place in 2018, so trial counsel should have been well aware of our supreme court's decision.

¶ 42    The State's primary rationale for dismissing this petition on the merits is that a decision by counsel about which witnesses to call is generally a matter of trial strategy that a court should not second-guess on a sixth amendment claim. While this is generally true, our supreme court made it clear in *People v. Tate*, 2012 IL 112214, ¶ 22, that this argument is not a basis for dismissal at the first stage of proceedings, but rather is "more appropriate to the second stage of postconviction proceedings, where both parties are represented by counsel, and where the petitioner's burden is to make a substantial showing of a constitutional violation." *Id.*; see also *People v. Burns*, 2015 IL App (1st) 121928, ¶ 32 (concluding under *Tate* such a "strategy argument" regarding counsel's decision not to call a witness is not an appropriate basis for dismissing a postconviction petition at the first stage).

¶ 43    The State also argues that expert testimony would have been inconsistent with the defense theory presented at trial. However, the defense was focused on all the flaws in the claims by the

two State witnesses that they could identify Mr. Reynolds as the backseat shooter. There were a myriad of circumstances that undermined the reliability of these identifications, including that it was a drive-by shooting that offered little opportunity for an eyewitness to view the shooter, Mr. Garrett acknowledged that he only got a glimpse of the side of the shooter's face, no witness identified Mr. Reynolds until more than three years after the shooting, neither witness offered a description of the shooter before identifying Mr. Reynolds, both witnesses had criminal records and some motive to lie, and neither witness expressed specific confidence in his identifications.

¶ 44    While the primary focus, particularly for Mr. Butler, was on his motives to give false testimony, there would be nothing inconsistent in defense counsel arguing to the jury that, even if they believed the witnesses were trying to tell the truth, they may have been mistaken about their identifications. Testimony by an expert about a person's ability to perceive and recall another's identity, the impact of nighttime viewing, and the stress of a shooting could have potentially bolstered the defense's case.

¶ 45    Mr. Reynolds must also make a showing that the failure to call an expert arguably prejudiced the outcome of this trial. Unlike deficiency, which focuses on the reasonableness of what counsel did at the outset, prejudice requires us to examine whether it impacted the outcome. In this case, as Mr. Reynolds points out in his brief, the jury struggled for several days to reach a verdict and sent out several questions, some of which reflected their difficulty in reaching unanimity. The only issue really before the jury was the credibility of the eyewitnesses' identification testimony. Thus, it is at least arguable that the failure to call an expert, who might have cast further doubt on that testimony, prejudiced Mr. Reyolds.

¶ 46    While we agree with the dissent that there is no *per se* rule that a claim of ineffective

assistance based on the failure to call an identification expert will always survive first-stage postconviction scrutiny, where, as in this case, the identification evidence was the State's whole case and the jury appeared to have questions about that evidence, the failure to call an expert does meet the low bar of a gist of a sixth amendment claim. This case, like *Hayes* and *Vasquez*, turned entirely on eyewitness identifications. *Lerma* found it to be an abuse of discretion for the trial court to exclude "relevant and probative testimony from a qualified expert that speaks directly to the State's only evidence" against a defendant. *People v. Lerma*, 2016 IL 118496, ¶ 32. At this first stage, the defendant's burden is only to show arguable deficiency and arguable prejudice. On this record, in light of these particular facts, we find that such a showing has been made.

¶ 47                                    IV. CONCLUSION

¶ 48    For the foregoing reasons we reverse the judgment of the circuit court.

¶ 49    Reversed.


¶ 50    NAVARRO, J., concurring in part and dissenting in part:

¶ 51    I agree with the majority analysis that rejects the State's forfeiture argument that Mr. Reynolds failed to raise his claim on direct appeal. I also agree that, where Mr. Reynolds is incarcerated, requiring him to procure an affidavit from an expert would be an "unreasonable burden." *Herring*, 2022 IL App (1st) 210355, ¶¶ 34-35.

¶ 52    However, I respectfully disagree with the majority's holding that Mr. Reynolds' counsel at trial was arguably deficient for not offering expert witness testimony regarding identification. In this case, Mr. Reynolds has not shown that counsel was arguably not functioning as "counsel," as guaranteed by the sixth amendment. *Easley*, 192 Ill 2d at 317.

¶ 53    The majority acknowledges that the State's primary identification witness was Mr. Butler.

Mr. Butler, however, knew Mr. Reynolds by name. Mr. Reynolds argues that Mr. Butler referred to him by the "wrong" name, "Antonio" rather than Antoine, but that distinction does not take away from the fact Mr. Butler testified that he knew Mr. Reynolds for approximately two years and had multiple conversations with him. See *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 44 (rejecting a defendant's claim of ineffective assistance of counsel for failing to present expert testimony on the reliability of eyewitness identification where a witness "recogniz[ed] [the defendant] from socializing with the Latin Brothers," a street gang to which the defendant used to belong).

¶ 54    Moreover, trial counsel filed a pretrial motion to suppress identification testimony and tested Mr. Butler through a full cross-examination that challenged his bias and motive to give false testimony, including his initial failure to identify Mr. Reynolds at the time of the shooting and Mr. Butler's identification coming years later after he had his own case pending. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 39 (rejecting a defendant's claim of ineffective assistance of counsel for failing to present expert testimony on the reliability of eyewitness identification where "the argument that trial counsel failed to conduct meaningful adversarial testing of the State's case is refuted by counsel's pretrial motion to suppress identification testimony and extensive cross-examination and argument at trial"). I cannot say there would be any value in offering an expert witness regarding eyewitness identification when the primary witness knows the defendant.

¶ 55    I am wary of setting a standard that anytime there is eyewitness testimony, trial counsel is deficient if he or she does not offer an expert witness regarding the reliability of eyewitness identification. I acknowledge that trial strategy is a second-stage consideration. See *Tate*, 2012 IL 112214, ¶ 22. But, where Mr. Reynolds' trial counsel challenged the eyewitness identification by a thorough cross-examination of the State's witnesses, I cannot say his counsel's performance was

arguably deficient.